## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **CLEAR HEARING SOLUTIONS,** | | |
| **LLC et al** | : | **CIVIL ACTION** |
| *Plaintiff,* | : | |
| | : | |
| **v.** | : | **No. 20-3454** |
| | : | |
| **CONTINENTAL CASUALTY CO.** | : | |
| *Defendant.* | : | |

## MEMORANDUM

As a product of government efforts to slow the spread of the COVID-19 disease, businesses across the country have suffered income losses. Plaintiffs Clear Hearing Solutions, LLC, Clear Hearing Solutions II, LLC, Clear Hearing Solutions III, LLC, and Clear Hearing Solutions IV, LLC (collectively, "Clear Hearing"), bring two breach of contract claims and one claim of bad faith against their insurer, Continental Casualty Company, for denying them coverage for their losses under their all-risk property insurance policies.

### I.    FACTUAL BACKGROUND[1]

Plaintiffs are limited liability companies that operate hearing aid stores and provide hearing tests, hearing aids, and after-care for existing patients. Stipulated Statement of Material Facts and Applicable Law, ECF No. 12, ¶ 2. They are citizens of Pennsylvania. *Id.* ¶ 3. Defendant Continental Casualty Co. is an Illinois insurance company. *Id.* ¶ 4.[2]

---

[1] The following facts are taken from the parties' Stipulated Statement of Material Facts and Applicable law and its attachments unless otherwise noted. The facts are also undisputed unless otherwise noted.

[2] Because the parties are completely diverse and the amount in controversy exceeds $75,000, this Court has jurisdiction pursuant to 28 U.S.C. § 1332(a).

Defendant Continental Casualty Co. issued a policy to Clear Hearing effective September 18, 2019, to September 18, 2020 providing property and liability coverage ("the Policy") for three of Plaintiffs' properties in Maryland and four in North Carolina. *Id.* ¶ 5. Clear Hearing paid the premium for the policy. *Id.* ¶ 6.

When the virus that causes COVID-19 (the "coronavirus") began spreading in the United States, governments began taking measures to slow the spread of the disease. On March 23, 2020, Maryland Governor Hogan issued an order, which was later extended and restated, directing all "Non-Essential Businesses" to close to the general public, and defined such businesses to include "all businesses . . . that are <u>not</u> part of the critical infrastructure sectors identified by the U.S. Department of Homeland Security[] . . . ." *Id.*, Ex. B at 2. It linked to a DHS website including guidance on critical infrastructure workforces, and Maryland issued interpretive guidance along with the March 23 order. *Id.*, Ex. B at 2, Ex. E. The DHS's website included "Healthcare/Public Health" as an Essential Critical Infrastructure sector and listed "diagnostic and therapeutic technicians and technologists" as examples of caregivers who are essential workers in that sphere. *See id.* Ex. C at 6. Maryland's interpretive guidance document also listed "[d]iagnostic facilities, including radiology, imaging, and laboratory facilities" and "[m]anufacturers and distributors of medical equipment and supplies" as among the health care and public health sector facilities that may remain open. *Id.*, Ex. D at 2, 4. On March 30, Maryland Governor Hogan issued an Executive Order requiring residents to stay at home except to conduct or participate in essential activities and providing that staff and owners of Non-Essential Businesses were permitted on-site at their Non-Essential Business locations "for the purposes of engaging in Minimal Operations, which included administrative functions or, in the case of retail establishments, continuing to sell retail products on a delivery basis." *Id.*, Ex. E.

On March 27 and April 23, North Carolina Governor Roy Cooper also signed orders regarding COVID-19.  Stip. ¶ 13.  The North Carolina orders required *non-essential* businesses to "cease all activities within the State except Minimum Basic Operations."  *Id.* Ex F. at 3. Those operations involve the "minimum necessary activities to maintain the value of the business's inventory, preserve the conditions of the business's physical plant and equipment, ensure security, process payroll and employee benefits, or related functions," and "[t]he minimum necessary activities to facilitate employees of the business being able to continue to work remotely from their residences."  *Id.*, Ex F. at 10.  Alternatively, "Essential Businesses" permitted to continue operations included "Healthcare and Public Health Operations," which included "medical device and equipment" and "other healthcare facilities and suppliers and providers of any related and/or ancillary healthcare services."  *Id.*, Ex F. at 6.  North Carolina also imposed a stay-at-home order that allowed citizens to leave their homes only for essential activities, which included obtaining medical supplies or medication, visiting a healthcare professional, working in healthcare and public health operations, and receiving goods and services provided by a COVID-19 Essential Business or Operation.  *Id.*, Ex. F at 5.

According to the Complaint but disputed by Continental, Clear Hearing's businesses are non-essential.  Pl.'s Compl. (Case No. 20-3454, ECF No. 1) at ¶ 10.  The coronavirus was not present at any of Clear Hearing's covered properties.  Stip. at ¶ 15.  Instead, Clear Hearing sought coverage from Continental for alleged losses they sustained "due to being shut down by government mandate, due to the COVID-19 ongoing crisis" in Maryland and North Carolina.  *Id.* ¶ 16.  Before the Court, they allege that the Policy includes four property coverage provisions that provide coverage for their alleged losses: Business Income coverage, Extra Expense Coverage, Extended Business Income coverage, and Civil Authority coverage. Compl. at ¶ 7.

Continental denied coverage under the Policy.  *Id.* ¶ 17.  Plaintiffs then filed the instant action alleging two breach of contract claims and a claim of bad faith against Continental under 42 Pa. C.S.A. ¶ 8371.  Compl.  Continental answered the complaint, and the parties filed a stipulated statement of facts and cross-motions for summary judgment.  ECF Nos. 12, 13, 14.  The parties' summary judgment motions, along with their response and reply briefs, are now before the Court.

## II.      LEGAL STANDARD

Summary judgment is proper when there is no genuine dispute of material fact and the movant is entitled to judgment as a matter of law.  *See* Fed R. Civ. P. 56(a).  The moving party bears an initial burden of proving a lack of any genuine issues of material fact.  *See Matsushita Elec. Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 & n. 10 (1986).  After that burden is met, the nonmoving party must "come forward with specific facts showing there is a genuine issue for trial."  *Id.* (internal citations and quotation marks omitted).  A factual dispute is "material" if it "might affect the outcome of the suit under the governing law."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  And a dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  All facts "should be viewed in the light most favorable to the non-moving party, with all reasonable inferences [drawn] in that party's favor."  *Jutrowski v. Township of Riverdale*, 904 F.3d 280, 2988 (3d Cir. 2018) (quoting *Scheidemantle v. Slippery Rock Univ. State Sys. of Higher Educ.*, 470 F.3d 535, 538 (3d Cir. 2006) (internal quotation marks omitted)).  Summary judgment is warranted where the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  "In such a

situation, there can be no genuine issue as to any material fact, since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Id.* (internal citations and quotation marks omitted).

## III.   DISCUSSION

Clear Hearing claims that Continental breached their insurance contract by failing to provide Business Income coverage, Extended Business Income coverage, and Extra Expense coverage (Count I) and Civil Authority coverage (Count II) to Clear Hearing for its pandemic-related losses.  Compl. at 8, 9.  Clear Hearing also brings a bad faith claim.  *Id.* at 11.

### a.   Breach of Contract (Counts I and II)

#### 1.   Insurance Policy

"The parties agree that Pennsylvania law applies to the interpretation of Plaintiff's insurance policy with Defendant."  Stip. ¶ 1.[3]  Under Pennsylvania law, "[c]ontract interpretation is a question of law that requires the court to ascertain and give effect to the intent of the contracting parties as embodied in the written agreement."  *In re Old Summit Mfg., LLC*, 523 F.3d 134, 137 (3d Cir. 2008) (internal citation omitted).  The language of an insurance policy "must be construed in its plain and ordinary sense, and the policy must be read in its entirety." *Pennsylvania Nat. Mut. Cas. Ins. Co. v. St. John*, 106 A.3d 1, 14 (Pa. 2014) (internal citation omitted).

---

[3] The forum state's choice-of-law rules govern in diversity cases.  *See Gen. Star Nat. Ins. Co. v. Liberty Mut. Ins. Co.*, 960 F.2d 377, 379 (3d Cir. 1992).  Under Pennsylvania law, the Court must first "determine whether a conflict exists between the laws of the competing states."  *Auto-Owners Ins. Co. v. Stevens & Ricci Inc.*, 835 F.3d 388, 404 (3d Cir. 2016) (citation omitted).  "If there are no relevant differences between the laws of the two states, the court need not engage in further choice-of-law analysis, and may instead refer to the states' laws interchangeably."  *Id.* Because the parties have agreed on an applicable law, the Court assumes for purposes of this opinion that there are no material differences between the potentially applicable state laws and accordingly will consider the Policy under Pennsylvania law.

The Court's analysis begins with whether a provision in the insurance policy is ambiguous.  When insurance policy language is "clear and unambiguous," a court applying Pennsylvania law must "give effect to that language." *401 Fourth St. v. Inv'rs Ins. Co.*, 879 A.2d 166, 170 (Pa. 2005).  "Alternatively, when a provision in the policy is ambiguous, the policy is to be construed in favor of the insured to further the contract's prime purpose of indemnification and against the insurer, as the insurer drafts the policy, and controls coverage." *Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Commercial Union Ins. Co.*, 908 A.2d 888, 897 (Pa. 2006) (quoting *401 Fourth St.*, 879 A.2d at 170) (internal quotation marks omitted).[4]  A policy is ambiguous "if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." *Madison Const. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 106 (Pa. 1999) ((quoting *Hutchison v. Sunbeam Coal Co.*, 519 A.2d 385, 390 (1986)).  Under Pennsylvania law, "ambiguity (or the lack thereof) is to be determined by reference to a particular set of facts." *Id.* at 607.  The "proper focus regarding issues of coverage under insurance contracts is the reasonable expectation of the insured." *Bubis v. Prudential Prop. & Cas. Ins. Co.*, 718 A.2d 1270, 1272 (Pa. Super. Ct. 1998).

The insured party bears the burden to "make a prima facie showing that a claim falls within the policy's grant of coverage." *State Farm Cas. Co. v. Estates of Mehlman*, 598 F.3d 105, 111 (3d Cir. 2009) (applying Pennsylvania law).  Once that burden is met, the insurance company "bears the burden of proving the applicability of any exclusions or limitations on

---

[4] Because the policy at issue was drafted by one party and only signed by the other, it is also an adhesion contract. Under the doctrine of *contra proferentem*, "any ambiguous language in a contract is construed against the drafter and in favor of the other party if the latter's interpretation is reasonable." *Colorcon, Inc. v. Lewis*, 792 F. Supp. 2d 786, 797 (E.D. Pa. 2011) ((citing *Sun Co. v. Pa. Tpk. Comm'n*, 708 A.2d 875, 878-79 (Pa. Commw. Ct. 1998) (citing Restatement (Second) of Contracts § 206))).

coverage." *Koppers Co. v. Aetna Cas. & Sur. Co.*, 98 F.3d 1440, 1446 (3d Cir. 1996) (applying

Pennsylvania law).

### 2.   Policy

Clear Hearing asserts its losses are covered under the Policy.  Its all-risk policy insures

against "direct physical loss of or direct physical damage to Covered Property . . . caused by or

resulting from a Covered Cause of Loss."  Stip. Ex. A at 19.  "Covered Cause of Loss" is defined

as "risks of direct physical loss unless the loss is Excluded . . . or Limited . . . ."  *Id.* at 20-21.

Clear Hearing claims that its losses are covered under the Business Income, Extra Business

Income, Extra Expense, and Civil Authority Coverage endorsements of the Policy.  Compl. ¶ 7.

The Business Income coverage provision covers certain losses of business income caused

by direct physical loss of or damage to the covered property.  It provides that Continental:

> will pay for the actual loss of Business Income you sustain due to the necessary
> 'suspension' of your 'operations' during the 'period of restoration.'  The
> 'suspension' must be caused by direct physical loss of or damage to property at
> the described premises.  The loss or damage must be caused by or result from a
> Covered Cause of Loss.

Stip. Ex. A at 41.  The Policy defines "suspension" as the "partial or complete cessation of [the

insured's] business activities" or that "a part or all of the described premises is rendered

untenantable" (*id.* at 38), and "operations" means "the type of [the insured's] business activities

occurring at the described premises and tenantability of the described premises" (*id.* at 36).  The

"period of restoration" is defined as the time that (a) "begins with the date of direct physical loss

or damage caused by or resulting from any Covered Cause of Loss at the described premises"

and "[e]nds on the earlier of" (1) the "date when the property at the described premises should be

repaired, rebuilt or replaced with reasonable speed and similar quality," or (2) the "date when

business is resumed at a new permanent location." *Id.*

Extended Business Income coverage extends the eligible Business Income coverage beyond the end of the period of restoration.  It does not apply to losses "incurred as a result of unfavorable business conditions caused by the impact of the Covered Cause of Loss in the area where the described premises are located."  *Id.* at 41. But, "[i]f the necessary 'suspension' of [the insured's] 'operations' produces a Business Income loss payable" under that provision, Continental "will also pay for the actual loss of Business Income [the insured] sustain[s] during the period that" (1) "begins on the date the property is actually repaired, rebuilt or replaced and 'operations['] are resumed" and "[e]nds on the earlier of":

> the date you could restore your 'operations' with reasonable speed, to the level which would generate the Business Income amount that would have existed if no direct physical loss or damage occurred; or (2) [s]ixty consecutive days after the date [property is actually repaired, rebuilt or replaced and operations are resumed].

*Id.* at 42.

Under the Policy's separate Extra Expense coverage provision, Continental agreed to "pay Extra Expense (other than the expense to repair or replace property) to:

> (1) Avoid or minimize the 'suspension' of business and to continue 'operations' at the described premises or at replacement premises or temporary locations, including relocation expenses and costs to equip and operate the replacement premises or temporary locations; or (2) [m]inimize the 'suspension' of business if you cannot continue 'operations.'

*Id.* at 42.  "Extra Expense" under this provision "means reasonable and necessary expenses [the insured] incur[s] during the 'period of restoration' that [it] would not have incurred if there had been no direct physical loss of or damage to property caused by or resulting from a Covered Cause of Loss."  *Id.*

The Policy also includes an endorsement for Civil Authority coverage providing that:

> When the Declarations show that [the insured has] coverage for Business Income and Extra Expense,  [it] may extend that insurance to apply to the actual loss of Business Income [it] sustain[s] and reasonable and necessary Extra Expense [it] incur[s] caused by

action of civil authority that prohibits access to the described premises.  The civil authority action must be due to direct physical loss of or damage to property at locations, other than described premises, caused by or resulting from a Covered Cause of Loss.

*Id.* at 67.

### 3.  Prima Facie Coverage

Under Pennsylvania law, the Court first determines whether Clear Hearing has met its burden of establishing coverage under the Policy's affirmative coverage grant.  *See State Farm*, 598 F.3d at 111.  The policy provisions that Clear Hearing invokes share certain essential elements.  Business Income and Extra Expense coverage is tied to "direct physical loss of or damage to property at the described premises."  Stip. Ex. A at 41.  Business Income coverage requires the suspension of operations to be caused by "direct physical loss of or damage to property" of the insured, while the Extra Expense endorsement covers costs that "would not have been incurred if there had been no direct physical loss of or damage to property."  *Id.*  Each coverage also depends on the existence of a "covered cause of loss."  The Business Income and Extra Expense coverages apply where the "direct physical loss of or damage to" property is caused by or resulting from a "Covered Cause of Loss."[5]  *Id.*  Additionally, the Civil Authority Coverage applies where an action of civil authority prohibits access to the insured's premises due to "direct physical loss of or damage to" property at locations other than the insured's caused by or resulting from a "Covered Cause of Loss."  *Id.* at 67.

### i.  Direct Physical Loss of or Damage to Property

For Clear Hearing to state a prima facie claim of coverage under the Business Income endorsements or the Extra Expense endorsement, it must show it has suffered "direct physical

---

[5] Because eligibility for Extended Business Income coverage is predicated on eligibility for Business Income coverage, coverage under the extended provision is also tied to "direct physical loss of or damage to" property caused by or resulting from a covered cause of loss.  *Id.* at 41.

loss of or damage to" its property.  The parties sharply dispute the meaning of that phrase.  Clear Hearing contends that "direct physical loss of . . . property" is not limited to physical alteration of the property but includes loss of use of its property.  Because Continental failed to define "direct physical loss of or damage to" in its Policy, Clear Hearing argues that its interpretation, if reasonable, must govern.

Third Circuit precedent is on point and instructive here.  In *Port Authority of New York and New Jersey*, the Circuit addressed whether the presence of asbestos in a building constituted "direct physical loss or damage" under New Jersey law.  *Port Auth. of N.Y. & N.J. v. Affiliated MF Ins. Co.*, 311 F.3d 226, 235 (3d Cir. 2002).  The Court explained that "[i]n ordinary parlance and widely accepted definition, physical damage to property means distinct, demonstrable, and physical alteration of its structure."  *Id.* (quoting 10 Couch on Ins. § 148:46 (3d ed. 1998)).  But damage by sources unnoticeable to the naked eye must "meet a higher threshold" than "typical examples of physical damage from an outside source that may demonstrably alter the components of a building."  *Id.* at 235.  Recognizing that the policy at hand also covered "physical loss," the Court concluded that the "proper standard for 'physical loss or damage' is one that triggers coverage:

> only if an actual release of asbestos fibers from asbestos containing materials has resulted in contamination of the property such that its *function is nearly eliminated or destroyed, or the structure is made useless or uninhabitable,* or if there exists an *imminent threat* of the release of a quantity of asbestos fibers that would cause such *loss of utility*.

*Id.* at 236 (emphasis added).  The criteria for 'physical loss' caused by a source "unnoticeable to the naked eye" is thus "whether the functionality of the . . . property was nearly eliminated or destroyed, or whether the[] property was made useless or uninhabitable" by that source.  The "mere presence of asbestos, or the general threat of future damage from that presence, lacks the distinct and demonstrable character necessary for first-party insurance coverage."  *Id.*  This test

is consistent with Pennsylvania law. *See Motorists Mut. Ins. Co. v. Hardinger*, 131 F. App'x 823, 826 (3d Cir. 2005) (finding an issue of material fact existed under Pennsylvania law as to whether a house's functionality was nearly eliminated or destroyed, or made useless or uninhabitable, by the presence of e coli in a well).

The Court agrees with and adopts the conclusion reached by another Court in this district. In *4431, Inc. et al v. Cincinnati Ins. Cos.*, the Court concluded that, "under Pennsylvania law, for Plaintiffs to assert an economic loss resulting from their inability to operate their premises as intended within the coverage of the Policy's 'physical loss' provision, the loss and the bar to operation from which it results must bear a causal relationship to some *physical condition* of the premises." No. 5:20-cv-04396, 2020 WL 7075318, at *11 (E.D. Pa. Dec. 3, 2020) (emphasis in original). There must also be an "element correlating to [the] extent of operational utility – *i.e.,* a premises must be uninhabitable and unusable, or nearly as such." *Id; see also Brian Handel D.M.D. v. Allstate Ins. Co.*, No. 20-3198, 2020 WL 6545893 (E.D. Pa. Nov. 6, 2020) (finding *Port Authority* and *Hardinger* preclude a finding of "direct physical loss of or damage to" property where it remained inhabitable and usable, albeit in limited ways). In sum, while structural damage is not required to show "direct physical loss of" property, the source that destroys the property's utility must have something to do with the physical condition of the premises.

And so, the Court must determine whether there is a genuine dispute of material fact as to whether Clear Hearing's losses "bear some causal connection to the physical condition of the premises" and whether those conditions "operate[d] to completely or near completely preclude operation of the premises as intended." *4431, Inc.*, 2020 WL 7075318, at *10. Clear Hearing expressly disclaims that the virus was on its property. Stip. ¶ 15. Instead, it claims that the

government orders operated as a blockade preventing its employees and patrons from using the property for its intended purpose.  Compl. ¶ 12.

      This loss, even assuming *arguendo* that the government orders prohibited Clear Hearing and its customers from entering the property, does not bear a causal connection to the physical condition of its premises.  Because Clear Hearing expressly denies the existence of anything affecting the physical condition of its premises, its losses are a mere loss of use untethered to the physical condition of the property itself.  Reading "direct physical loss of or damage to property" to contemplate mere loss of use is not a reasonable interpretation because it renders two other Policy provisions superfluous or nonsensical.

      First, it would create discord between the business income and associated endorsements and the Civil Authority coverage endorsement.  If mere loss of use is a "direct physical loss," then a government order barring access to a property or mandating its closure would already trigger business income or extra expense coverage.  There would be no need for a separate Civil Authority endorsement granting coverage when civil authority orders bar access to premises under more limited circumstances.

      Second, mere loss of use counting as "direct physical loss of" property does not make sense in relation to the "period of restoration" language.  Business Income and Extra Expense coverage is only provided during the period of restoration, defined in part as the time that begins "with the date of direct physical loss or damage" and ends on the earlier of the date when the property is either "repaired, rebuilt or replaced" or when "business is resumed at a new permanent location."  Stip. Ex. A at 36.[6]  Built into coverage for business income, extra expense,

---

[6] Extended Business Income is similarly available during the period immediately after the period of restoration, beginning "on the date the property is actually repaired, rebuilt or replaced and 'operations['] are resumed."  *Id.* at 42.

or extended business income losses under the Policy, then, is the idea that there must be something to repair, rebuild, or replace – none of which exists for mere loss of use untethered to a physical condition of the property.  *See Newman Myers Kreines Gross Harris, P.C. v. Great N. Ins. Co.*, 17 F. Supp. 3d 323, 332 (S.D.N.Y. 2014) ("The words 'repair' and 'replace' contemplate physical damage to the insured premises as opposed to loss of use of it.").  Clear Hearing argues its failure to demonstrate a period of restoration is "without merit" in the context of its losses because "[t]here is nothing that requires physical repair or replacement; rather Plaintiffs['] services were paused . . . in light of the continued existence of the pandemic and the lack of return to normalcy."  Pl. Response Br. at 19-20, ECF No. 15.  But the Court cannot ignore the period of restoration language; it must construe the Policy as a whole.  By admitting that the period of restoration language cannot be satisfied by its losses, Clear Hearing demonstrates that its losses are not the kind that are protected by provisions granting coverage only during or immediately after that period.

Clear Hearing also relies on *Friends of Danny Devito v. Wolf* to support its claims.  *See* 227 A.3d 872 (Pa. 2020).  In that case, the Pennsylvania Supreme Court found that the COVID-19 pandemic qualifies as a natural disaster under a statute that defines natural disasters as events that result in "substantial damage to property, hardship, suffering or possible loss of life."  *Id.* According to Clear Hearing, this case shows that the virus causes "damage to property," not just economic losses; that, because it was compared to a natural disaster, it must be sufficiently similar to fires and earthquakes such that it is also covered under property insurance policies; and that the actual presence of the virus at its property is not dispositive.

*Danny Devito* does not support Clear Hearing's claims.  First, the Pennsylvania Supreme Court did *not* hold that COVID-19 causes property damage.  It held that COVID-19 is a natural

disaster that triggers the Governor's executive authority because the pandemic "is unquestionably a catastrophe that 'results in . . . hardship, suffering or possible loss of life.'" *Devito*, 227 A.3d at 888 (ellipses in original) (quoting 35 Pa. Cons. Stat. § 7102); *compare* 35 Pa. Cons. Stat. § 7102 ("catastrophe which results in *substantial damage to property*, hardship, suffering or possible loss of life") (emphasis added).  Second, *Danny Devito* has nothing to do with property insurance.  So its discussion of a statute triggering executive authority for various natural disasters has no bearing on how the Court must construe the plain language of an insurance contract, and its discussion of the existence of the virus throughout the Commonwealth of Pennsylvania has no bearing on the application of property insurance coverage to properties in North Carolina and Maryland where the plaintiffs expressly disclaim the presence of the virus.[7]

Clear Hearing also argues that its losses are covered because the Policy does not include a virus exclusion present in some other property insurance policies.  But "[a] loss which does not properly fall within the coverage clause cannot be regarded as covered thereby merely because it is not within any of the specific exceptions . . . ."  *Port Auth.*, 311 F.3d at 234 (quoting 10 Couch on Ins. 148:48 (3d ed. 1998)).  And it is at least plausible that the physical manifestation of some type of virus could cause covered losses.  That situation is just not present here.

Clear Hearing has therefore failed to show it suffered covered "direct physical loss or damage" to its property.

### ii.    Covered Cause of Loss

The Policy defines a covered cause of loss as "risks of direct physical loss unless the loss

---

[7] For similar reasons, Clear Hearing's argument that its situation is similar to cases in which courts found physical loss or damage when asbestos, ammonia, or other physical sources were on properties and affected the properties' functionality misses the mark because Clear Hearing expressly claims the virus is not on its property.

is Excluded . . . or Limited . . . ."  Stip. Ex. A at 20-21.  A covered cause of loss must cause the "direct physical loss of or damage to" Clear Hearing's property for purposes of the Business Income, Extended Business Income, and Extra Expense endorsements.  For purposes of Civil Authority Coverage, a covered cause of loss must cause the "direct physical loss of or damage to" property other than Clear Hearing's, and the government must take an action prohibiting access to Clear Hearing's property due to that loss of or damage to the other property.  Stip. Ex. A at 67.  The government orders cannot constitute a covered cause of loss under either the Business Income and Extra Expense coverages or the Civil Authority Coverage provisions.

Clear Hearing argues that the government orders are the covered cause of loss that caused its business losses.  ECF No. 13-1 at 9; Compl. ¶ 12.  As explained above, if loss of use caused by a civil authority order can constitute "direct physical loss of or damage to" property for purposes of business income and extra expense coverage, there would be no need for the Civil Authority endorsement.  Said another way, a civil authority order cannot itself be a "covered cause of loss" that causes loss of or damage to Clear Hearing's property if the same order is required to be "caused by or resulting from a Covered Cause of Loss" for purposes of Civil Authority coverage.  Stip. Ex. A at 67.

Clear Hearing's complaint also alleges that the government orders caused direct physical loss and damage to *nearby* property for purposes of coverage under the Civil Authority endorsement.  But as a matter of logic, the civil authority orders that purportedly affected access to Clear Hearing's property cannot have been issued due to loss or damage caused to other property by the same orders.

Nor has Clear Hearing shown a genuine dispute of material fact as to whether the coronavirus is a covered cause of loss that caused loss of or damage to nearby property, and that

the government issued an order prohibiting access to Clear Hearing's stores *due* to that loss or damage.  First, the civil authorities issued their orders to address the health crisis, not some "direct physical loss of or damage to" other property.  *See, e.g.,* Stip. Ex. B at 1 (explaining that the March 23 Maryland order was issued to "reduce the threat to human health caused by transmission of the novel coronavirus in Maryland, []to protect and save lives, . . . [and to] control the spread of COVID-19,"); *see also id.* Ex. F at 3 (explaining that the March 27 North Carolina order was issued to "mitigate community spread of COVID-19 and to reduce the burden on the state's health care providers and facilities").

Clear Hearing has also not demonstrated any facts to show the existence of any direct physical loss of or damage to nearby property.  In support of its argument, it cites *Danny Devito* and an unpublished, out-of-circuit case, which do not save its claim.  As explained, *supra*, Danny *Devito* does *not* hold that COVID-19 causes property damage, and the Middle District of Florida case Clear Hearing cites merely denied the insurance company's motion to dismiss that was exclusively premised on the Policy's virus exclusion.  *See Urogynecology Specialist of Florida LLC v. Sentinel Ins. Co. Ltd.*, No. 6:20-cv-1174, 2020 WL 5939172 (M.D. Fla. Sept. 24, 2020).[8]

Clear Hearing has not shown a genuine dispute of material fact as to whether the government orders were issued due to physical loss of or damage to nearby property, and without such direct physical loss or damage, there can be no coverage.

---

[8] In any event, even if the coronavirus were present on other properties, that presence would not mean that other properties suffered "direct physical loss" or "damage" as those terms apply in the Policy.  Actual or imminent contamination of a property by the coronavirus does not meet the requirements for direct physical loss of or damage to property under *Port Authority* because surfaces could be disinfected and contamination would not render properties useless or uninhabitable.  *Port Auth.*, 311 F.3d at 235.

Separately, Clear Hearing has not shown a genuine dispute of material fact with respect to whether the government orders prohibited access to its premises.  Clear Hearing argues that it meets this requirement because the orders barred the public from its premises.  *See, e.g.,* ECF No. 13-1, at 16.  In support, it argues that residents of Maryland and North Carolina were required to remain in their homes other than to conduct essential activities, that the orders directly prohibited its businesses from operating because its businesses were nonessential, and that its customers' access to its stores were totally prohibited.  As a first point, Clear Hearing fails to adequately respond to Continental's argument that its businesses were actually essential diagnostic facilities or businesses supplying medical devices and equipment under the respective state orders.  *See* ECF No. 14-1 at 28 (citing Stip. Ex. C at 4, Ex. F at 6).

But even assuming that its businesses were non-essential, employees were permitted to enter the business premises to perform basic operations.  *See* Stip. Exs. E at 2, F at 9.  Clear Hearing concedes that such access existed.  *See* ECF No. 15 at 21 ("The fact that Plaintiffs' owners could access their hearing aid stores to process payroll or maintain security is hardly not a prohibition of access in the context of businesses which exist to provide services to various types of patrons.").  This ability to access the property reveals that a prohibition on access to the properties is absent.  *See Handel*, 2020 WL 6545893, at *3 ("[P]laintiff's property remained inhabitable and usable, albeit in limited ways.").  Clear Hearing's argument – even setting aside whether or not its businesses were actually essential – fails to distinguish "between [their] place of business (*i.e.*, the physical premises where they operate their business), and the business itself."  *Pappy's Barber Shops, Inc. v. Farmers Grp.* No. 20-cv-907, 2020 WL 5500221, at *6

(S.D. Ca. Sept. 11, 2020).  Because access to their place of business was not "prohibited" by government order, Clear Hearing has also not satisfied this prerequisite for coverage. [9]

### 4.   Counts I and II

The Court recognizes that courts in other jurisdictions have either found coverage under similar policies or allowed cases to survive motions to dismiss.  But upon review of those non-binding cases, Clear Hearing's Policy, and relevant caselaw from the Third Circuit, the Court finds that Clear Hearing has not met its burden to show prima facie coverage under its policy under either the Business Income, Extended Business Income, or Extra Expense coverages (Count I), or the Civil Authority coverage (Count II).  Because it has not met this burden, it has not shown that it is entitled to summary judgment on its breach of contract claims or that a genuine dispute of material fact exists that would warrant a denial of summary judgment to Continental.

### b.   Bad Faith Claim (Count III)

Finally, Clear Hearing claims that Continental is liable for acting in bad faith.  For an action arising under an insurance policy, an insurer/defendant may be liable for interest, punitive damages, court costs, and attorney fees if the insurer acted in bad faith toward the insured/plaintiff.  *See* 42 Pa. C.S.A. § 8371.  For a plaintiff to succeed on a bad faith claim, two elements must be satisfied by clear and convincing evidence.  *Klinger v. State Farm Mut. Auto. Ins. Co.,* 115 F.3d 230, 233 (1997).  The plaintiff must demonstrate that 1) "the insurer did not

---

[9] Plaintiff cites *Narricot Industries* for the proposition that prohibition on operating a facility constitutes a "prohibition of access" under Pennsylvania law. *See Narricot Indus., Inc. v. Fireman's Fund Ins. Co.*, No. 01-4679, 2002 WL 31247972 (E.D. Pa. 2002). But that case is distinguishable. While two industrial plants were ordered not to operate, the city also prohibited access to the road that led to one plant, and prohibited road travel to all but emergency personnel around the other. *Id.* at 1-2. Because individuals could not travel on roads that led to the facilities, there was a prohibition on access not present here.

have a reasonable basis for denying benefits under the policy" and 2) "the insurer knew or recklessly disregarded its lack of reasonable basis in denying the claim." *Wolfe v. Allstate Property & Cas. Ins. Co.*, 790 F.3d 487, 498 (3d Cir. 2015) (citing *Terletsky v. Prudential Property & Cas. Ins. Co.*, 649 A.2d 680, 688 (Pa Super. Ct. 1994)).  Bad faith can include "[a]ny frivolous or unfounded refusal to pay proceeds of a policy," though "mere negligence or bad judgment is not bad faith." *Id.* (quoting *Terletsky*, 649 A.2d at 688).  In § 8371 claims, the underlying issue is "the *manner* in which insurers discharge their duties of good faith and fair dealing during the pendency of an insurance claim." *Wolfe*, 790 F.3d at 499 (emphasis in original) (citation omitted).  Bad faith can also include a bad-faith delay, *see, e.g., Kosierowski v. Allstate Ins. Co.*, 51 F. Supp. 2d 583, 588 (E.D. Pa. 1999), aff'd 234 F.3d 1265 (3d Cir. 2000), or a "lack of investigation into the facts[] or a failure to communicate with the insured." *Frog, Switch & Mfg. Co., Inc. v. Travelers Ins. Co.*, 193 F.3d 742, 751 n.9 (3d Cir. 1999).

A bad faith claim is an "independent cause of action to an insured that is not dependent upon success on the merits, or trial at all, of the contract claim." *Nealy v. State Farm Mut. Auto. Ins. Co.*, 695 A.2d 790, 792-93 (Pa. Super. Ct. 1997).  But, if a bad-faith claim is premised solely on the denial of coverage, the claim must necessarily fail if a court finds that no coverage exists. *See Gallatin Fuels*, *Inc. v. Westchester Fire Ins. Co.*, 244 F. App'x 424, 435 (3d Cir. 2007) ("[I]f the insurer [is] correct as a matter of law in denying coverage, there is no basis for the [bad faith] claim" premised solely on a refusal to provide coverage) (citing *Frog, Switch*, 193 F.3d at 751 n.9).  On the other hand, "if bad faith is asserted as to conduct beyond a denial of coverage, the bad faith claim is actionable as to that conduct regardless of whether the contract claim survives." *Gold v. State Farm Fire & Cas. Co.*, 889 F. Supp. 2d 587, 598 (E.D. Pa. 2012) (citing *Gallatin Fuels*, 244 F. App'x at 435) (analyzing plaintiff's bad faith claim because it was "based

largely on behavior beyond [Defendant's] denial of the claim"). That distinction has been accepted when, for example, an insured claims the insurer investigated his claim in bad faith in addition to a bad-faith denial of coverage. *See id.* (collecting cases).

Clear Hearing's bad faith claim consists of three paragraphs in the complaint: (1) that "Defendant CNA has no actual basis for declining complete coverage of the plaintiffs' claims for damages" (Compl. ¶ 38); (2) that "[t]he refusal of defendant to compensate plaintiffs CHS for losses sustained and its practices in the handling of the claim constitute bad faith towards the insured" (*id.* ¶ 39); and (3) that "Defendant has declined coverage in an intentional, willful and wanton disregard of the terms of the Policy." The first and third paragraph, and the extent to which the second paragraph alleges that the refusal to compensate plaintiffs was in bad faith, relate solely to the denial of coverage. Accordingly, Clear Hearing's bad-faith claim with respect to that conduct must fail because the Court has found the Policy does not cover Clear Hearing's losses. *See Gallatin Fuels*, 244 F. App'x at 435.

The Court then turns to Clear Hearing's allegation that Continental exhibited bad faith "in its practices in the handling of the claim." Compl. ¶ 39. In its motion, Clear Hearing argues that Continental's bad faith is evinced by Continental's immediate denial of Clear Hearing's claim "without conducting any investigation," and without addressing or acknowledging Clear Hearing's interpretation of "direct physical loss," instead relying on "case law providing a restrictive interpretation of the term 'direct physical loss'" to deny its claim as part of a policy to limit the company's losses during the pandemic. To the extent that these allegations may be construed to extend beyond bad faith in the denial itself to bad faith in the investigatory process or process of denial, Clear Hearing has not met its burden. In the context of a claim for coverage based solely on government closure orders, and on Civil Authority orders where nearby property

has not suffered direct physical loss of or damage to property and access to plaintiff's property

has not been prohibited, there is nothing to investigate: coverage does not exist on the face of

that claim.  Therefore, Clear Hearing has not shown bad faith in Continental's lack of

investigation or by denying Clear Hearing's claim "in light of the current context of mass denials

of COVID-19 related business interruption claims."  Discovery on this issue would not change

that conclusion.  Nor does Continental's purported reliance on caselaw that this Court concludes

correctly interprets "direct physical loss of or damage to" with respect to Clear Hearing's claims

indicate bad faith. Accordingly, Clear Hearing has not shown its entitlement to damages on its

bad faith claim or an existence of a dispute of material fact as to Continental's bad faith.[10]

## IV.     CONCLUSION

Because the Policy does not cover Clear Hearing's losses, the Court will deny summary

judgment to Clear Hearing and will grant summary judgment to Continental on Counts I and II

of the complaint.  And because Clear Hearing has not shown bad faith or the existence of a

dispute of material fact as to that bad faith, the Court will deny summary judgment to Clear

Hearing on Count III and grant summary judgment to Continental on Count III of the complaint.

---

[10] Plaintiff cites this Court's previous opinion in *1009 Clinton Properties, LLC v. State Farm Fire & Cas. Co.*, in which the Court held that, without discovery, a plaintiff could never know whether a claim was denied in bad faith.  *See* No. 18-5286, 2019 WL 1023889 (E.D. Pa. Mar. 4, 2019).  But that case focused on whether the plaintiff had sufficiently pleaded whether "the insurer knew or recklessly disregarded its lack of reasonable basis in denying the claim."  *Id.* at *3 (quoting *Wolfe*, 790 F.3d at 498); *see also id.* at *5 ("Other than the length of time, a plaintiff will never know whether a denial was done in bad faith, i.e., whether the insurance company denied the plaintiff's claim knowing it did not have a reasonable basis to do so.").  It also took place at the motion to dismiss stage, when the Court had not yet decided whether the insurance contract was breached.  *Id.*  Here, the Court has concluded that the contract was not breached and that the Policy does not cover Clear Hearing's losses, so as a matter of law Continental did not "kn[ow] or recklessly disregard its lack of reasonable basis in denying the claim."  *Id.*; *see also Gallatin Fuels*, 244 F. App'x at 435.